## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID TURNER, BICKEY DHAKAL, LISA DUDA, TERRY SCHIAZZA, JASON HENSEL, ANGELA BLACKWELL, AND ANTONIA FREEMAN, individually and as representatives of a class of participants and beneficiaries on behalf of the Schneider Electric 401(k) Plan,<br><br>*Plaintiffs*,<br><br>v.<br><br>SCHNEIDER ELECTRIC HOLDINGS, INC., THE SCHNEIDER ELECTRIC HOLDINGS, INC. BENEFITS COMMITTEE, THE SCHNEIDER ELECTRIC HOLDINGS, INC. INVESTMENT COMMITTEE, AON HEWITT INVESTMENT CONSULTING, INC. (NKA AON INVESTMENTS USA, INC.), AND JOHN DOES 1–14,<br><br>*Defendants*. | No. _____<br><br>CLASS ACTION |

## COMPLAINT

1.     Plaintiffs David Turner, Bickey Dhakal, Lisa Duda, Terry Schiazza, Jason Hensel, Angela Blackwell, and Antonia Freeman (née Antonia Cabal), individually and as representatives of a class of participants and beneficiaries of the Schneider Electric 401(k) Plan, bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants Schneider Electric Holdings, Inc., the Schneider Electric Holdings, Inc. Benefits Committee, the Schneider Electric Holdings, Inc. Investment Committee, Aon Hewitt Investment Consulting, Inc. (nka Aon Investments USA, Inc.), and John Does 1–14, for breach of fiduciary duties and

prohibited transactions under ERISA.[1]

2.      The marketplace for retirement plan services is established and competitive. Multi-billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to obtain high quality, low-cost administrative, managed account, and investment management services. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable, and the Plan's investments are prudent. These duties are the "highest known to the law", and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, the Schneider Electric Defendants and Aon Hewitt selected and retained proprietary Aon Hewitt collective investment trusts that only benefitted Aon Hewitt, including investing over $3 billion of Plan participants' retirement savings in the newly created and untested Aon Hewitt Index Retirement Solution target date funds. Instead of using the Plan's bargaining power to benefit participants and beneficiaries, the Schneider Electric Defendants also caused unreasonable expenses to be charged to the Plan and participants for recordkeeping, investment management, and managed account services.

3.      To remedy these breaches of duty, Plaintiffs, individually and as

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461. All Defendants are collectively referred to as "Defendants". Aon Hewitt Investment Consulting, Inc. is referred to as "Aon Hewitt". The Schneider Electric affiliated defendants are referred to as the "Schneider Electric Defendants."

representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.   **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

5.   **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where at least one of the alleged breaches took place and where at least one defendant resides.

6.   **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also

show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a. The named Plaintiffs suffered harm to their individual accounts as a result of Defendants' fiduciary breaches. During the proposed class period, with the exception of Plaintiff Blackwell, all of the named Plaintiffs invested in the Aon Hewitt Index Retirement Solution Funds, which Defendants selected and retained as the Plan's target date fund option. Plaintiffs Turner and Freeman also invested in the Aon Hewitt Growth Fund, the Aon Hewitt Income Fund, and the Aon Hewitt Inflation Strategy Fund. By providing the Aon Hewitt collective investment trusts, Defendants caused millions of dollars in performance losses to all participants who invested in these funds.

b. The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the Schneider Electric Defendants' breach in retaining Vanguard Group, Inc. as the Plan's recordkeeper without properly monitoring and reducing the compensation paid to Vanguard from the Plan, which came out of each participant's account. That excessive compensation includes payments that Vanguard received from providing managed account services. Had Vanguard's compensation been reduced to reasonable levels, every participant's account would have had fewer recordkeeping fees deducted and would

have been of higher value in light of those fees and the investment
return on those fees.

c.   The named Plaintiffs suffered harm to their individual accounts as a
result of the Schneider Electric Defendants selecting and retaining
higher-cost shares of the Plan's investments, including the Aon Hewitt
collective investment trusts and the Vanguard mutual funds. Had the
Schneider Electric Defendants provided the lowest-cost shares of the
Plan's investments, every participant's account would have had fewer
investment management fees deducted and would have been of higher
value in light of those fees and the investment return on those fees.

d.   Plaintiffs Turner and Blackwell and all participants who participated
in the Vanguard Managed Account Program suffered losses to their
individual accounts because each participant's account in a managed
account was assessed an unreasonable managed account fee, which
would not have been incurred had the Schneider Electric Defendants
discharged their fiduciary duties to the Plan and reduced those fees to
a reasonable level.

## PARTIES

### The Schneider Electric 401(k) Plan

7.   The Plan is a defined contribution, individual account, employee
pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) in which certain
employees of Schneider Electric may participate.

8.   The Plan is established and maintained under a written document

called the "Schneider Electric 401(k) Plan" in accordance with 29 U.S.C. §1102(a)(1), last amended and restated effective January 1, 2017.

9.      The Plan was formed on January 1, 2010 after the consolidation of predecessor defined contribution plans to provide retirement income for eligible employees of Schneider Electric. ████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████ █████████

10.     Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

11.     As of December 31, 2013, the Plan had $2.2 billion in net assets and 18,751 participants with account balances. By December 31, 2018, the Plan had grown to $3.7 billion in net assets and 26,475 participants with account balances.

12.     Based on plan assets, the Plan is among the largest 0.03% of all

defined contribution plans in the United States. Industry professionals commonly refer to plans of such great size as "jumbo plans" or "mega plans." The Plan's massive size gives it enormous bargaining power to command very low investment management, managed account and recordkeeping fees for its participants.

### Plaintiffs

13.     David Turner is a former employee of Schneider Electric. He resides in Charlotte, North Carolina. He participated in the Plan until approximately 2019. However, he is still a "participant" under 29 U.S.C. §1002(7) for the purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is eligible to receive his share of the amount by which his account would have been greater had Defendants not breached their fiduciary duties.

14.     Bickey Dhakal is a former employee of Schneider Electric. He resides in Centreville, Virginia. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Lisa Duda is a former employee of Schneider Electric. She resides in Chesterfield, Virginia. She was a participant in the Plan until approximately February 2020. However, she is still a "participant" under 29 U.S.C. §1002(7) for the purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because she is eligible to receive her share of the amount by which her account would have been greater had Defendants not breached their fiduciary duties.

16.     Terry Schiazza is a current employee of Schneider Electric. He resides

in Seneca, South Carolina. He is a participant in the Plan under 29 U.S.C. §1002(7)

because he and his beneficiaries are or may become eligible to receive benefits

under the Plan.

17.     Angela Blackwell is a former employee of Schneider Electric. She

resides in Columbia, Maryland. She was a participant in the Plan until

approximately 2019. However, she is still a "participant" under 29 U.S.C. §1002(7)

for the purposes of bringing this action on behalf of the Plan under 29 U.S.C.

§1132(a)(2) because she is eligible to receive her share of the amount by which her

account would have been greater had Defendants not breached their fiduciary

duties.

18.     Jason Hensel is a former employee of Schneider Electric. He resides in

Grafton, Wisconsin. He was a participant in the Plan until approximately 2019.

However, he is still a "participant" under 29 U.S.C. §1002(7) for the purposes of

bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is

eligible to receive his share of the amount by which his account would have been

greater had Defendants not breached their fiduciary duties.

19.     Antonia Freeman (née Antonia Cabal) is a former employee of

Schneider Electric. She resides in Salem, Oregon. She was a participant in the Plan

until approximately December 2019. However, she is still a "participant" under 29

U.S.C. §1002(7) for the purposes of bringing this action on behalf of the Plan under

29 U.S.C. §1132(a)(2) because she is eligible to receive her share of the amount by

which her account would have been greater had Defendants not breached their

fiduciary duties.

## Defendants

20.     Schneider Electric Holdings, Inc. is a Delaware corporation and wholly owned indirect subsidiary of Schneider Electric SA, a French limited liability company headquartered in Rueil-Malmaison, France. Schneider Electric's North American headquarters are in Andover, Massachusetts.

21.     Schneider Electric is the Plan Sponsor under 29 U.S.C. §1002(16). Schneider Electric also is the employer of the Plan's other fiduciaries. As alleged herein, Schneider Electric exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

22.     ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

---

[2] Schneider Electric 401(k) Plan, Jan. 1, 2017, at §1.4 ("2017 Plan"); Charter of the Schneider Electric Holdings, Inc. Benefits Committee, Dec. 2018 ("Benefits Committee Charter").

[3] Benefits Committee Charter at A-9.

[4] Benefits Committee Charter at A-9; Schneider Electric 401(k) Plan, Jan. 1, 2010, at §§1.4, 1.9 ("2010 Plan"); 2017 Plan, §§1.4, 1.9.

████████████████████████████████████████████████████

████████████████████████████████. [5]

23.     The Benefits Committee controls and manages the operation and administration of the Plan. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████▌

24.     ████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ [7]

25.     The Benefits Committee and its individual members exercise discretionary authority or discretionary control respecting the management of the Plan and exercise authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in

[5] 2010 Plan, §9.5; Benefits Committee Charter at A-9.
[6] 2010 and 2017 Plans, §9.2.
[7] 2010 Plan, §9.2(i).

the administration of the Plan and are fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

26.     The Schneider Electric Holdings, Inc. Investment Committee ("Investment Committee") and its individual members are named fiduciaries under 29 U.S.C. §1102(a)(2) ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████.[11]

27.     The Investment Committee and its individual members exercise discretionary authority or discretionary control respecting the management of the Plan and exercise authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

28.     John Does 1–14 are unknown members of the Benefits Committee and

---

[8] 2017 Plan, §9.3; Charter of the Schneider Electric Holdings, Inc. Investment Committee, Dec. 2018 ("Investment Committee Charter"); Investment Policy Statement, Schneider Electric Holdings, Inc. 401(k) Plans, Feb. 2015, at 2 ("2015 IPS").
[9] 2017 Plan, §9.3.
[10] 2015 IPS at 1; 2017 Plan, §9.3.
[11] Investment Committee Charter at 6.

the Investment Committee that exercise discretionary authority or discretionary control respecting the management of the Plan or exercise authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

29.     Because the Schneider Electric individuals and entities described above acted as alleged herein as agents of Schneider Electric, these defendants are collectively referred to hereafter as the "Schneider Electric Defendants" unless otherwise indicated.

30.     Aon Hewitt Investment Consulting, Inc. ("Aon Hewitt") is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Chicago, Illinois. In March 2020, the firm began operating as Aon Investments USA, Inc. ███████████████████████████████ ██████████████████████████████, Aon Hewitt provided investment consulting services for a fee on behalf of the Plan. 29 U.S.C. §1002(21)(A)(ii). Aon Hewitt served in that capacity until January 7, 2016.

31.     ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████ Aon Hewitt functions as the discretionary investment manager for the Plan in accordance with 29 U.S.C. §1002(38).

32.     As alleged herein, prior to January 7, 2016, Aon Hewitt rendered investment advice for a fee with respect to the Plan's assets, or had authority or

responsibility to do so, and was a fiduciary under 29 U.S.C. §1002(21)(A)(ii), and

separately, since January 7, 2016, Aon Hewitt is the investment manager with

power to manage, acquire, or dispose of any asset of the Plan, who is a registered

investment adviser under the Investment Advisers Act of 1940, and is a fiduciary

under with 29 U.S.C. §1002(38).

## ERISA'S FIDUCIARY STANDARDS

33.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part,

that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
>> (A)    for the exclusive purpose of
>>
>>> (i)  providing benefits to participants and their beneficiaries; and
>>> (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
>> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

34.    Under ERISA, fiduciaries that exercise any authority or control over

plan assets, including, but not limited to, the selection of plan investments and

service providers, must act prudently and for the *exclusive* benefit of participants in

the plan, monitor the funds in the plan and remove imprudent or excessively

expensive funds. Fiduciaries cannot act for the benefit of third parties, including

service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

35.     An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id.* at 435.

36.     A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S.*

*Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29

C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have

"a continuing duty to monitor investments and remove imprudent ones" within a

reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

37.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.

29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly

participating in a breach by another fiduciary and knowingly failing to cure any

breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of
> this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan in
> the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing such
> act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in
> the administration of his specific responsibilities which give rise
> to his status as a fiduciary, he has enabled such other fiduciary
> to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless
> he makes reasonable efforts under the circumstances to remedy
> the breach.

## BACKGROUND FACTS

38.    "Defined contribution plans dominate the retirement plan scene

today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private

sector, such plans have largely replaced the defined benefit pension plans that were

America's retirement system when ERISA was enacted in 1974. The consulting firm

Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that

the type of retirement plan offered by the companies has essentially flipped over the last three decades.[12] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to newly hired employees. Defined contribution plans have become America's retirement system.

39.     A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

40.     Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

41.     Most of the fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. In addition, since the early 2000s, managed account services make up a third category of fees assessed to participants. Administrative and investment-related expenses can "significantly reduce the value

---

[12] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

of an account in a defined-contribution plan." *Id.*

42.     The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). (One basis point is equal to 1/100th of one percent.) The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

43.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring service providers, such as recordkeepers and managed account providers, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. Those selections each have their own fees that are deducted from the returns that participants receive on their investments.

44.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[13] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost

---

[13] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

$500,000, as shown in the following graph.[14]



45.     Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion-dollar plans, like the Plan, which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

46.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans, collecting the highest amount possible for recordkeeping and managed account services, rolling plan participants' money out of the plan and into proprietary Individual Retirement Accounts, soliciting the purchase of wealth management

---

[14] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

services, credits cards and other retail financial products, and maximizing the number of non-plan products sold to participants. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

47.     Fiduciaries must be cognizant of service providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations by including proprietary funds and proprietary managed account services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

### DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I.    Starting on February 1, 2017, Defendants completely restructured the Plan to include proprietary Aon Hewitt collective investment trusts that served only to benefit Aon Hewitt.**

48.     In January 2016, Schneider Electric and the Investment Committee contracted with Aon Hewitt to be the discretionary investment manager for the Plan. Prior to this date, Aon Hewitt was the non-discretionary investment consultant to the Investment Committee, ███████████████████████

████████████████████████████████████████████████



49.

50.

---

[15] Schneider Electric Holdings, Inc. Investment Management Agreement, Defined Contribution Plan Services, Jan. 7, 2016 ("Inv. Mgmt. Agr."), at Sch. A.

[16] *Id.*

[17] *Id.*

████.[18] This gave Aon Hewitt free reign to select its own funds, while also purportedly serving in the role of independently evaluating available investments to provide to Plan participants. Selecting its own funds is exactly what Aon Hewitt did.

51.     After Aon Hewitt became the Plan's discretionary investment manager, in February 2017, Aon Hewitt completely restructured the investment lineup for the Plan and three other Schneider Electric benefit plans: the Schneider Electric USA, Inc. Coordinated Bargaining Employees' Retirement Savings Plan, the Industrial Repair Services 401(k) Plan, and the Schneider Electric Supplemental Defined Contribution Plan.

52.     Effective February 1, 2017, Aon Hewitt replaced all investment options in the Plan and added Aon Hewitt's proprietary funds: the Aon Hewitt Index Retirement Solution target date funds (Class S), the Aon Hewitt Income Fund (Class S), the Aon Hewitt Growth Fund (Class S), and the Aon Hewitt Inflation Strategy Fund (Class S). Defendants also added the Vanguard Capital Preservation Fund as the Plan's stable value option.

53.     Besides being Aon Hewitt funds selected by Aon Hewitt, the Plan's Aon Hewitt funds (Class S shares) were new investment options with no performance history. They were created by Aon Hewitt in "partnership with Schneider Electric."[19] Although other share classes existed for a limited time for the Aon

---

[18] *Id.*, Sch. C.
[19] Schneider Electric Transition Guide, *Invest in Your Retirement: A New Direction for Your Financial Future*, at 6 ("Transition Guide").

Hewitt Income, Growth, and Inflation Strategy funds, the Aon Hewitt index target date funds did not previously exist in any share class. They were placed in the Plan on February 1, 2017, *the first day they existed*. As alleged in further detail, placing these funds in the Plan violated prudent fiduciary standards and the Investment Committee's existing investment policy governing the selection, monitoring and removal of Plan investments.

54.     The Aon Hewitt investments added to the Plan are collective investment trusts, which are investment vehicles maintained by a bank that consist of pooled assets of "retirement, pension, profit sharing, stock bonus or other trusts exempt from Federal income tax". 29 CFR §9.18(a)(2). A collective investment trust is similar to a mutual fund or other pooled investment vehicle because it also invests in a variety of securities to create a diversified investment portfolio.

55.     As a non-depository bank, Aon Trust Company LLC maintains the Aon Hewitt collective investment trusts and is the trustee of the funds. Both Aon Trust Company and Aon Hewitt are wholly owned subsidiaries of Aon Consulting, Inc. Aon Trust Company hired Aon Hewitt—effectively hired itself—as the investment adviser to perform investment advisory and investment management services with respect to each fund. Rather than actually managing the assets of the Aon Hewitt collective investment trusts, Aon Hewitt hires one or more investment managers to do the actual investing of the assets. The assets of the funds may be invested in another investment vehicle, such as a mutual fund or collective investment trust. Both Aon Trust Company and Aon Hewitt charge a fee for their respective trustee

and investment advisory services.

56.     As the investment adviser of these collective investment trusts, Aon Hewitt had a direct conflict of interest between acting in the exclusive best interest of Plan participants as the Plan's discretionary investment manager while also seeking to grow its collective investment trust business and maximize its revenue through investment advisory fees. Moreover, Plan participants were not informed that Aon Hewitt served as the Plan's discretionary investment manager, or otherwise had a direct conflict of interest by selecting its own proprietary investments.

57.     Following the decision to add the proprietary Aon Hewitt funds to the Plan, Aon Hewitt has earned substantial revenue from the investment advisory fees charged on the funds. Its collective investment trust business has materially benefitted from the Plan's immediate and substantial investment of billions of dollars in Aon Hewitt's proprietary funds. The Plan has invested over 80% of its net assets in the Aon Hewitt funds. As of December 31, 2017, Aon Hewitt managed over $3.3 billion of the Plan's $3.9 billion in net assets, and as of December 31, 2018, over $2.8 billion of the Plan's $3.7 billion in net assets. The investment of Plan assets in Aon Hewitt's proprietary funds resulted in Aon Hewitt earning over $600,000 annually in additional revenue. ███████████████████████████

██████████████████████████████████████████████████████

██████████████████████[20]

58.     Although Aon Hewitt acted as the Plan's discretionary investment manager over Plan investments, Aon Hewitt did not have complete discretion over investment decisions. ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████"[21]

59.     The Schneider Electric Defendants exercised this right and exerted discretionary authority or control over the Plan's investments. In October 2017, the Schneider Electric Defendants and Aon Hewitt added to the Plan five Vanguard index mutual funds, which Aon Hewitt previously removed from the Plan in connection with the February 2017 changes to the Plan's investment lineup. These Vanguard index funds included: the Vanguard Developed Market Index, the Vanguard Emerging Markets Stock Index, the Vanguard Extended Market Index, the Vanguard Institutional Index, and the Vanguard Total Bond Market Index funds. However, as described in further detail, the Schneider Electric Defendants selected the higher-cost Institutional shares rather than the lower-cost Institutional Plus shares that were available and were previously provided to participants with respect to four Vanguard index mutual funds.

---

[20] ████████████████████████████████████████████████████████ ████████████████████████████. Schneider Electric paid these expenses. Once Aon Hewitt became the Plan's discretionary trustee, Plan participants paid Aon Hewitt's expenses.

[21] Inv. Mgmt. Agr., Sch. A (2.b.).

60.    In addition, the Schneider Electric Defendants assessed a separate asset-based "recordkeeping expense" (1 bp) on the Vanguard index mutual funds. This fee was paid to Aon Hewitt putatively for overseeing and monitoring the Vanguard index funds. This fee was assessed even though Plan participants were not charged a separate asset-based expense when the Schneider Electric Defendants provided the lower-cost shares of the index funds prior to 2017.

## II. Because of the corporate partnership between Schneider Electric and Aon Hewitt, the Schneider Electric Defendants allowed Aon Hewitt to benefit itself by adding its proprietary investments to the Plan.

61.    In light of the following facts and the long-standing business relationship between Schneider Electric and Aon Hewitt, it is evident that the Schneider Electric Defendants allowed Aon Hewitt to add its proprietary funds to the Plan for Aon Hewitt's interest and not for the exclusive interest of Plan participants, and in return, Aon Hewitt reduced the cost to Schneider Electric of the corporate benefits plans for which Schneider Electric was liable.

62.    Since at least 2010, the Schneider Electric Defendants contracted with Aon affiliated companies to provide consulting services to Schneider Electric's corporate plans. Like the Plan, Schneider Electric is the plan sponsor and the Benefits Committee is the plan administrator for the Schneider Electric defined benefit plans: the Schneider Electric USA, Inc. Coordinated Bargaining Employee Pension Plan ("Coordinated Bargaining Pension Plan") and the Schneider Electric Pension Plan ("Pension Plan"). (The Pension Plan was terminated effective September 17, 2018.) ████████████████████████████████

█████████████████████████████████████████████████

████████████████████████.[22]

63.     From at least 2010 through 2018, the Schneider Electric Defendants retained Aon Consulting, Inc. to provide general consulting services to the two Schneider Electric pension plans. In addition, since 2017, the Benefits Committee retained Alight Solutions, LLC ("Alight") to provide general consulting services to these plans. Aon Consulting and Alight are affiliated with Aon Hewitt. Between the two pension plans since 2010, the Schneider Electric Defendants caused these Aon Hewitt affiliates to be paid over $9.4 million.

64.     Since at least 2013, the Schneider Electric Defendants also caused the Coordinated Bargaining Pension Plan and the Pension Plan (prior to termination) to invest in Aon Hewitt collective investment trusts: the Non-U.S. Equity (since 2013), the U.S. Large Cap Passive (since 2017), and the High-Yield Bond Fund (since 2017). As of December 31, 2016, these pension plans invested over $93 million in Aon Hewitt's Non-U.S. Equity Fund. As the investment adviser of those collective investment trusts, Aon Hewitt earned additional compensation through investment advisory fees for managing the Aon Hewitt investments placed in the pension plans.

65.     The corporate relationship between Schneider Electric and Aon Hewitt affiliates is not limited to 401(k) and pension plan services. Alight has "long" provided "health and welfare benefits administration" to Schneider Electric and also

---

[22] Investment and Benefits Committees Charters.

began providing benefits management software to the company.[23] Alight markets this "partner[ship]" with Schneider Electric to attract potential clients. Apart from the press release announcing Schneider Electric's partnership with Alight for health and welfare benefits administration, Alight has issued an eight-page "case study" touting Schneider Electric's business while also promoting the services performed by Alight.

66.     Following the Plan's 2017 fund changes, Aon Hewitt affiliated entities substantially reduced the expenses charged on Schneider Electric's corporate pension plans. According to the Forms 5500 for the Coordinated Bargaining Pension Plan, Aon Consulting reduced its compensation for the corporate plan—not the 401(k) Plan—by 31% in 2017, and 70% in 2018, compared to the expenses paid in 2016. (For 2016, Aon Consulting was paid $426,065 in comparison to $294,606 and $129,363 in 2017 and 2018, respectively.) For the Schneider Electric Pension Plan, again paid for by corporate dollars, Aon Consulting reduced its expenses by 38% in 2017, and 79% in 2018, compared to the expenses paid in 2016. (For 2016, Aon Consulting was paid $1,208,559 in comparison to $751,451 and $249,133 in 2017 and 2018, respectively.) The additional revenue that Aon Hewitt collected from the Plan's investment in the Aon Hewitt collective investment trusts more than offset the reduction in expenses charged to the Schneider Electric pension plans. Thus, Plan participants subsidized Schneider Electric's corporate expenses.

---

[23] Alight Press Release, *Schneider Electric 'goes home' to Alight Solutions,* https://alight.com/research-insights/case-study-schneider-electric.

III.   **Defendants used Plan participants' retirement assets to seed the untested Aon Hewitt Index Retirement Solution target date funds at the expense of Plan participants.**

67.   Target date funds are designed to provide a single diversified investment vehicle for participants. In general, they can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date. For instance, target date "2030" funds are designed for individuals who intend to retire in 2030.

68.   From the Plan's inception until February 1, 2017, Vanguard provided the Plan's target date funds. From 2010 through approximately 2012, the Vanguard Target Retirement mutual funds (Investor shares) were provided. From 2013 through February 2017, collective investment trust versions of the Vanguard target date mutual funds were provided through the Vanguard Target Retirement Trusts: Class I shares through approximately 2013, and Plus shares from 2014 until their removal.

69.   In replacing the Vanguard Target Retirement Trusts with the Aon Hewitt Index Retirement Solution Funds, Defendants failed to "balance the relevant factors and make a reasoned decision as to the preferred course of action— under circumstances in which a prudent fiduciary would have done so", which is a breach of fiduciary duty. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 788 (7th Cir. 2011). There was no loyal or prudent reason to replace the Vanguard target date funds, which were maintained by an established investment manager

28

with a long tenure, historically performed better than peers, and were top-rated by industry professionals.

70.     Founded on May 1, 1975, Vanguard has offered investment products to investors for over 45 years.[24] Vanguard has offered target date mutual funds since 2003, and lower-cost collective investment trust versions (I shares) since 2007.[25] Each year from 2012–2017, Vanguard received the highest Morningstar Analyst Rating for Target-Date Series mutual funds.[26] Vanguard also has been the top target date fund provider (by assets under management) since 2014, and as of 2017, Vanguard had over $381 billion invested in its target date mutual funds.[27] Since before 2017, Vanguard's target date mutual funds have been strong performing target date funds,[28] and the Vanguard collective investment trust versions have experienced even better performance because they charge lower fees than their mutual fund equivalents.

71.     From 2010 through 2016, the Plan's Vanguard target date funds provided exceptional investment returns to Plan participants. As measured by

---

[24] Vanguard Chester Funds, Form N-1A, Jan. 27, 2017,
https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.
[25] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006,
https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.ht
m; Vanguard Target Retirement 2020 Trust I Fact Sheet,
https://institutional.vanguard.com/iippdf/pdfs/FS1464.pdf.
[26] John Croke, *Vanguard Earns Morningstar Gold,* June 21, 2019,
https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/
InvComVanguardMorningstarGold. Morningstar, Inc. is a leading provider of investment
research and investment services, and is relied on by industry professionals.
[27] Morningstar, 2019 Target Date Fund Landscape, at 9, 11
https://institutional.vanguard.com/iam/pdf/TDFLNDSCP.pdf.
[28] *E.g.,* Morningstar, 2019 Target Date Fund Landscape at 33; Vanguard Chester Funds,
Form N-1A, Jan. 27, 2017,
https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

Vanguard's target date mutual funds, over the trailing five-year period as of December 31, 2015, the Vanguard target date funds outperformed other target date funds managed by established investment managers, including J.P. Morgan, Fidelity, and American Century.[29] This consistent and strong performance would not cause a prudent fiduciary to replace these options absent a compelling reason to do so after weighing all relevant factors.

72. There was no compelling reason to replace Vanguard's target date funds with Aon Hewitt's Index Retirement Solution Funds, which *did not even exist* until February 1, 2017. Defendants placed them in the Plan the *first* day that they were available without any performance history. Defendants decided to add these funds to the Plan in May 2016, more than eight months before they existed.[30] Without a performance history to consider in evaluating the merit of the Aon Hewitt index target date funds, Defendants could not make a reasoned determination that these funds were prudent or in the best interest of Plan participants compared to Vanguard's target date funds with proven track records.

73. Selecting investment options for plan participants that have no performance history is imprudent. When making investment decisions, prudent

---

[29] Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm; J.P. Morgan Trust I, Form N-CSR, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/1217286/000119312516493430/d122175dncsrs.htm; Fidelity Aberdeen Street Trust, Form N-1A, May 28, 2016, https://www.sec.gov/Archives/edgar/data/880195/000137949116004218/filing717.htm; American Century Asset Allocation Portfolios, Inc., Form N-1A, Dec. 1, 2016, https://www.sec.gov/Archives/edgar/data/1293210/000129321016000305/acaap2016annualupdate485bp.htm.

[30] Transition Guide at pdf 2.

fiduciaries of defined contribution plans consider the performance history, portfolio

manager experience, and manager tenure of available investment alternatives. A

consistent performance history and investment strategy, among other factors,

demonstrate the ability of the investment manager to generate consistently

superior long-term investment results. At a minimum, prudent fiduciaries require a

five-year performance history for an investment option prior to its inclusion in a

401(k) plan.

74.     At the time that Defendants included the Aon Hewitt index target date

funds in the Plan, Aon Hewitt had only limited experience managing a target date

collective investment trust. Aon Trust Company and Aon Hewitt did not even begin

to offer collective investment trusts until October 2013.[31] Since that time, Aon

Hewitt only provided one other target date fund series to investors, the actively

managed Aon Hewitt Retirement Solution Funds. These funds had less than three

years of performance history at the time Defendants decided to place the Aon

Hewitt Index Retirement Solution Funds in the Plan.

75.     The limited performance history of Aon Hewitt's actively managed

target date funds was poor. As of June 30, 2016, *all* of the actively managed Aon

Hewitt Retirement Solution Funds underperformed their custom benchmark

selected by Aon Hewitt over all reporting periods (quarter, year-to-date, 1 year, 2

year, and since inception).[32] Since their inception, they also substantially

---

[31] Aon Hewitt Collective Investment Trust Offering Statement, Oct. 2016, at 61 ("Oct. 2016 Offering Statement").
[32] Oct. 2016 Offering Statement at 62.

underperformed the Plan's existing Vanguard Target Retirement Trust target date funds. From 2014–2016, they underperformed the Vanguard Target Retirement Trust alternative by approximately 200 bps on average.[33] (For 2014–2015, the Aon Hewitt active funds underperformed on average by 288 bps.)

76.     A prudent fiduciary would place no weight on the performance history of the *actively* managed Aon Hewitt Retirement Solution Funds to support the decision to include the untested Aon Hewitt *index* target date funds in the Plan. They are different products. The performance history also demonstrated that Aon Hewitt was unable to prudently manage a target date collective investment trust.

77.     ███████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ The IPS documents the investment process by which the Plan's fiduciaries determined was prudent when overseeing the Plan's investments. Once an IPS is adopted by fiduciaries, prudent fiduciaries follow its terms. Failure to follow its terms is direct evidence that the fiduciaries failed to employ a prudent investment process.

78.     By replacing the Plan's Vanguard target date funds with Aon Hewitt's untested index target date funds, Defendants violated their existing Investment Policy. At the time Defendants decided to replace the Vanguard target date funds with the Aon Hewitt target date funds, ████████████████████████

---

[33] This was determined by averaging the annual underperformance of the Aon Hewitt funds relative to the Vanguard target date funds for 2014–2016. With the exception of using the I shares for Vanguard's 2010 Trust fund for 2014 and 2015, the Vanguard Trust Plus shares were used.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████.”[34] The Plan's Aon Hewitt's Index Retirement

Solution Funds violated this Policy.

79.     For the benefit of Aon Hewitt, Defendants used Plan participants'

retirement assets to seed the brand-new Aon Hewitt Index Retirement Solution

Funds. The Schneider Electric Defendants were the first 401(k) plan fiduciaries in

the United States to select the Aon Hewitt Index Target Solution Funds for their

participants. By year-end 2017, Burger King Corporation was the only other

fiduciary that selected these funds for its employees' 401(k) plan, out of over

600,000 defined contribution plans in the United States, and that 401(k) plan had

only a fraction  of the assets of the Schneider Electric Plan—less than $79 million in

total plan assets

80.     As of December 31, 2017, and according to the Forms 5500 for the Aon

Hewitt collective investment trusts and the Plan, the Plan held *over 90%* of the total

assets invested in the Aon Hewitt index target date funds, and for four funds, *over

98%. See infra.* Without the Plan's investment, Aon Hewitt would only have 1/10[th] of

the assets under management in these products.

| Fund | Total Assets | Plan Assets | % |
|---|---|---|---|
| Aon Hewitt Index 2010 Retirement Solution | $95,388,045 | $87,019,901 | 91.23% |

---

[34] 2015 IPS at 2.

| Fund | Total Assets | Plan Assets | % |
|---|---|---|---|
| Aon Hewitt Index 2015 Retirement Solution | $201,475,994 | $186,068,913 | 92.35% |
| Aon Hewitt Index 2020 Retirement Solution | $448,812,347 | $425,978,644 | 94.91% |
| Aon Hewitt Index 2025 Retirement Solution | $671,301,466 | $650,134,186 | 96.85% |
| Aon Hewitt Index 2030 Retirement Solution | $576,599,688 | $566,118,421 | 98.18% |
| Aon Hewitt Index 2035 Retirement Solution | $441,700,465 | $433,352,243 | 98.11% |
| Aon Hewitt Index 2040 Retirement Solution | $278,284,725 | $275,780,078 | 99.10% |
| Aon Hewitt Index 2045 Retirement Solution | $437,074,953 | $210,204,650 | 48.09% |
| Aon Hewitt Index 2050 Retirement Solution | $110,506,707 | $109,029,442 | 98.66% |
| Aon Hewitt Index 2055 Retirement Solution | $99,200,321 | $86,793,874 | 87.49% |
| Aon Hewitt Index Retirement Income | $60,916,610 | $56,543,233 | 92.82% |
| **Total** | **$3,421,261,321** | **$3,087,023,585** | **90.23%** |

81.     Besides adding these new Aon Hewitt Index Retirement Solution Funds, Defendants also designed a mapping strategy to automatically transfer the assets invested in the replaced investment options to these target date funds. Participants who did not specify where to invest their assets that had been invested in a removed fund were mapped by Defendants to the Aon Hewitt index target date fund closest to their retirement date.[35]

82.     It is well known in the investment industry that when plan fiduciaries eliminate a fund and transfer (or map) the assets to another fund, few 401(k) participants undo that movement because participants rarely make trades in their plan account.[36] This mapping strategy therefore guaranteed that Aon Hewitt would receive a substantial percentage of the Plan's assets, and that is what occurred. As of December 31, 2016, only $975.2 million was invested in the Plan's existing Vanguard target date funds. By December 31, 2017, over $3 billion of the Plan's

---

[35] Transition Guide at 7.

[36] Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeshi Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 17–18 (June 2006).

$3.9 billion in assets (or 77%) was invested in Aon Hewitt's target date funds.

83.    Apart from this mapping strategy, Defendants ensured that a substantial portion of the Plan would continue to be invested in the Aon Hewitt index target date funds by designating the funds as the Qualified Default Investment Alternative (or QDIA). If a participant has not made or does not make an investment election, any contributions she receives or makes to the Plan are invested in the QDIA. 29 CFR §2550.404c-5(a)(1).

84.    The significance of a plan's target date fund option further underscores the importance of a prudent and loyal selection process and continuous oversight of that option. Participants may solely rely on their single target date fund selection over their investment horizon to meet their retirement goals. In fact, prior to 2017 fund changes, Schneider Electric recognized this by stating that target date funds, like the Aon Hewitt Index Retirement Solution Funds, are "often referred to as a 'set-it-and-forget-it' solution".[37] They also informed participants that Aon Hewitt's target date funds were "Do It for Me" investment options.[38] No prudent fiduciary would subject Plan participants to an untested fund that they heavily rely on to invest for retirement.

85.    Defendants' decision to add the Aon Hewitt index target date funds also caused Plan participants to pay higher investment management expenses for their target date fund. At the time of selection, the Aon Hewitt index target date funds charged up to 33% more than the Vanguard Retirement Trust target date

---

[37] Transition Guide at 5.
[38] Schneider Electric Savings Plans: 2017 Changes, Frequently Asked Questions, at C1.

funds (Plus shares). Based on the amount invested in the Aon Hewitt index target date funds as of December 31, 2017, Plan participants paid almost $500,000 each year in additional expenses.[39] Currently, the Plan's Aon Hewitt target date funds are even more expensive, further contributing to additional expenses paid by participants.

86.    From their inception, the Plan's Aon Hewitt Index Retirement Solution Funds have significantly underperformed and continue to underperform the Vanguard Target Retirement Trust Plus funds that were removed from the Plan. The following chart shows the total returns of the Aon Hewitt Index Retirement Solution Funds compared to the Vanguard Target Retirement Trust Plus Funds from April 1, 2017 through March 31, 2020.[40] Each of the Plan's Aon Hewitt funds underperformed the Vanguard target date fund alternative that was removed from the Plan.

| Fund | 2Q2017–1Q2020 |
|---|---|
| Aon Hewitt Index Retirement Income | -2.40% |
| Aon Hewitt Index Retirement Solution 2010 | -2.06% |
| Aon Hewitt Index Retirement Solution 2015 | -3.55% |
| Aon Hewitt Index Retirement Solution 2020 | -2.58% |
| Aon Hewitt Index Retirement Solution 2025 | -2.83% |
| Aon Hewitt Index Retirement Solution 2030 | -2.62% |
| Aon Hewitt Index Retirement Solution 2035 | -2.16% |
| Aon Hewitt Index Retirement Solution 2040 | -1.47% |
| Aon Hewitt Index Retirement Solution 2045 | -0.68% |
| Aon Hewitt Index Retirement Solution 2050 | -1.11% |
| Aon Hewitt Index Retirement Solution 2055 | -1.18% |

---

[39] Schneider Electric Savings Plan, Fee Disclosure Notice, Nov. 2016, at 4; Vanguard Target Retirement Trust Plus Fact Sheets.

[40] For 2017, the quarterly performance of the Class I shares was used for the Aon Hewitt index date funds based on lack of available information on the Class S shares.

87.     By being forced to invest in the Aon Hewitt Index Retirement Solution

Funds instead of the Vanguard Target Retirement Trust Plus Funds, Plan

participants lost in excess of $46 million of their retirement savings.[41]

## IV.     Defendants also caused the Plan to invest in proprietary actively managed Aon Hewitt funds with insufficient performance track records.

### A.     The Aon Hewitt Growth Fund

88.     In connection with the 2017 fund changes, Defendants added the

proprietary Aon Hewitt Growth Fund (Class S). The Fund is still an investment

option in the Plan. Using an active investment management strategy, this fund

seeks to achieve long-term growth of capital by investing in a diversified portfolio

that primarily consists U.S. and non-U.S. equity securities.

89.     In an active investment strategy, the investment manager uses her

judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an

attempt to generate investment returns that surpass a benchmark index, net of fees

that are higher in actively managed than passively managed funds. In a passive

investment strategy, the investment manager attempts to match the performance of

a given benchmark index by holding a representative sample of securities in that

index. Because no stock selection or research is necessary for the manager to track

the index and trading is limited, passively managed investments charge

significantly lower fees for investment management services.

---

[41] Damages were measured based on the difference in investment returns between the Aon Hewitt Index Retirement Solution Funds and the Vanguard Target Retirement Trust Plus Funds. For 2017, the performance of the Class I shares for the Aon Hewitt index target date funds were used.

90.     In light of the effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (Jan./Feb. 1991);[42] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

91.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

92.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance

---

[42] https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). The *worst-performing* mutual funds also show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

93.     Accordingly, investment costs are of paramount importance to prudent investment selection. A prudent fiduciary would not select as a plan investment option a more-expensive actively managed fund without determining that the fund is reasonably expected to outperform a cheaper index fund.

94.     Rather than actually managing the assets of the Fund, Aon Hewitt hires investment managers to do the actual investing of the assets. The assets are allocated among proprietary Aon Hewitt collective investment trusts (which are managed by unaffiliated investment managers) and several non-Aon Hewitt investments. This provides a layer of fees to Aon Hewitt for investment management, despite not doing the actual selection of securities in the funds.

95.     The Aon Hewitt Growth Fund did not have a sufficient performance record when it was added to the Plan. Although the Class S shares of the Aon Hewitt Growth Fund were created specifically for the Plan and did not exist until

February 1, 2017, Aon Hewitt offered the investment strategy through lower-cost Class I shares since October 1, 2013.[43] However, in any share class, the Fund had less than five years of performance. At or around the time Defendants decided to include the Fund in the Plan, the Fund underperformed its benchmark every year of its short existence.[44]

96.     The Vanguard Total World Stock Index Fund (Instl) (VTWIX) is a passively managed index fund that would have provided Plan participants similar exposure to domestic and international equity securities. From 2015 through 2019, the Vanguard index fund charged 8 to 13 bps, in comparison to 47 bps Aon Hewitt charged for the Growth Fund (Class S) since 2017, which is up to 487% more.[45]

97.     For the two calendar years that the Aon Hewitt Growth Fund (Class I) had an actual performance history (2014 and 2015), the Growth Fund substantially underperformed the Vanguard index alternative by over 100 bps each year.

98.     Despite the insufficient performance history of the Aon Hewitt Growth Fund and the demonstrated inability of Aon Hewitt to generate investment returns that exceeded its benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the actively managed Growth Fund to the Plan was in the best interest of Plan participants or prudent. The decision to include the Growth Fund in the Plan only served to benefit Aon Hewitt.

---

[43] Oct. 2016 Offering Stmt. at 61.

[44] Oct. 2016 Offering Stmt. at 61 (as of June 30, 2016, the Fund underperformed its benchmark year-to-date, one-year, two-year, and since inception).

[45] Schneider Electric Savings Plan, Fee Disclosure Notice, Nov. 2016, at 4; Aon Hewitt Growth Fund Fact Sheet Dec. 31, 2019; Morningstar.

99.     Since the Aon Hewitt Growth Fund was included in the Plan, it has underperformed both its benchmark and passively managed equivalents. By including the Growth Fund in the Plan, Plan participants lost retirement savings as measured by the difference in the investment returns between the Growth Fund and the Vanguard Total World Stock Index Fund.[46]

### B.     The Aon Hewitt Income Fund

100.     In connection with the 2017 fund changes, Defendants added the proprietary Aon Hewitt Income Fund (Class S), which is an intermediate-term bond fund. The Fund is still an investment option in the Plan. Using an active investment management strategy, this fund seeks to provide an income-oriented total return with some capital appreciation by investing in fixed income securities.

101.     Since at least October 2016, Aon Hewitt has allocated over 80% of the Fund's assets to its proprietary Aon Hewitt collective investment trusts (which are managed by unaffiliated investment managers). The remainder of the Fund's assets are invested in funds managed by unaffiliated investment managers.[47]

102.     The Aon Hewitt Income did not have a sufficient performance record when it was added to the Plan. Although the Class S shares of the Aon Hewitt Income Fund were created on February 1, 2017, Aon Hewitt offered the investment strategy through lower-cost Class I shares since October 1, 2013.[48] However, in any share class, the Fund did not have five years of performance. As of June 30, 2016,

---

[46] For 2017, the performance of the Class I shares was used.
[47] Oct. 2016 Offering Stmt. at 11; June 2019 Offering Stmt. at 14.
[48] Oct. 2016 Offering Stmt. at 61.

the Fund underperformed its benchmark for the prior two years and since inception.[49]

103.    The Vanguard Intermediate-Term Bond Index Fund (Instl Plus) (VBIUX) is comparable to the Aon Hewitt Income Fund by also investing in intermediate-term bond securities. From 2015 through 2019, the Vanguard index fund charged 4 bps.[50] In contrast, Aon Hewitt charged 39 bps in 2017, and 46 bps presently—1,100% more—for the Growth Fund (Class S).[51]

104.    For the two calendar years that the Aon Hewitt Income Fund (Class I) had an actual performance history (2014 and 2015), the Income Fund substantially underperformed the Vanguard index alternative by 101 to 253 bps annually.

105.    Despite the insufficient performance history of the Aon Hewitt Income Fund and the demonstrated inability of Aon Hewitt to generate investment returns that exceeded its benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the actively managed Income Fund to the Plan was in the best interest of Plan participants or prudent. The decision to include the Income Fund in the Plan only served to benefit Aon Hewitt.

106.    Since the Aon Hewitt Income Fund was included in the Plan, it has underperformed both its benchmark and passively managed equivalents. By including the Income Fund in the Plan, Plan participants lost retirement savings as measured by the difference in investment returns between the Growth Fund and

---

[49] *Id.*

[50] Morningstar.

[51] Schneider Electric Savings Plan, Fee Disclosure Notice, Nov. 2016, at 4; Aon Hewitt Income Fund Fact Sheet Dec. 31, 2019.

the Vanguard Total Intermediate-Term Bond Index Fund.[52]

### C.    The Aon Hewitt Inflation Strategy Fund

107.    In connection with the 2017 fund changes, Defendants added another proprietary Aon Hewitt fund, the Aon Hewitt Inflation Strategy Fund (Class S). The Fund is an inflation-protected bond fund and is still an investment option in the Plan. Using an active investment management strategy, this fund seeks to provide total return in excess of inflation by primarily investing in debt securities, including Treasury Inflation-Protected Securities. Aon Hewitt has allocated virtually all the assets to investments managed by unaffiliated investment managers.[53]

108.    The Aon Hewitt Inflation Strategy Fund did not have a sufficient performance record when it was added to the Plan. Although Class S shares of the Aon Hewitt Inflation Strategy Fund had no performance history because they were created on February 1, 2017, Aon Hewitt offered the investment strategy through lower-cost Class I shares since October 1, 2013.[54] However, in any share class, the Fund has less than five years of performance. As of June 30, 2016, the Aon Hewitt Inflation Strategy Fund underperformed its benchmark every year of its limited existence.[55]

109.    The Vanguard Inflation-Protected Securities Fund (Instl) (VIPIX) is comparable to the Aon Hewitt Inflation Strategy Fund by also investing in Treasury

---

[52] For 2017, the performance of the Class I shares was used.
[53] Oct. 2016 Offering Stmt. at 11; June 2019 Offering Stmt. at 14.
[54] Oct. 2016 Offering Stmt. at 61.
[55] *Id.* (as of June 30, 2016, the Fund underperformed for year-to-date, one year, two years, and since inception).

inflation-protected securities. Since before 2015, the Vanguard index fund charged 7 bps, while Aon Hewitt charged 24 bps in 2017—300% more—and 28 bps presently—400% more—for the Inflation Strategy Fund (Class S).[56]

110.    For the two calendar years that the Aon Hewitt Inflation Strategy Fund (Class I) had an actual performance history (2014 and 2015), the Inflation Strategy Fund substantially underperformed the Vanguard index alternative by 343 to 437 bps annually.

111.    Despite the insufficient performance history of the Aon Hewitt Inflation Strategy Fund and the demonstrated inability of Aon Hewitt to generate investment returns that exceeded its benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the Inflation Strategy Fund to the Plan was in the best interest of Plan participants or prudent. The decision to include the Inflation Strategy Fund in the Plan only served to benefit Aon Hewitt.

112.    Since the Aon Hewitt Inflation Strategy Fund was included in the Plan, it has underperformed both its benchmark and passively managed equivalents. By including the Inflation Strategy Fund in the Plan, Plan participants lost retirement savings as measured by the difference in investment returns between the Growth Fund and the Vanguard Inflation-Protected Securities Index Fund.[57]

---

[56] Schneider Electric Savings Plan, Fee Disclosure Notice, Nov. 2016, at 4; Aon Hewitt Inflation Strategy Fund Fact Sheet Dec. 31, 2019; Morningstar.
[57] For 2017, the performance of the Class I shares was used.

## V.   The Schneider Electric Defendants caused the Plan to pay unreasonable investment management fees.

113.   Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

114.   When providing investments to plan participants, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (*citing* Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the

investment function." Restatement (Third) of Trusts § 90 cmt. b.

115.   It is a simple principle of investment management that the larger amount an investor has available to invest, the lower the investment management fees that can be obtained in the market for a given investment vehicle. Large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Multi-billion-dollar defined contribution plans, such as the Plan, have even greater bargaining power.

116.   Mutual funds and collective investment trusts frequently offer multiple share classes. Because the only difference between the share classes is fees, selecting higher-cost shares results in the plan paying wholly unnecessary fees. Accordingly, absent a compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.[58]

117.   Given the Plan was as a mega plan based on its size, the Plan had tremendous bargaining power to obtain share classes with far lower costs than higher-cost shares. Lower-cost share classes of mutual fund and collective

---

[58] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).,
http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

investment trust investments were readily available to the Plan. Minimum

investment thresholds for the lowest-cost institutional shares are routinely waived

by the investment provider even if not reached by a single fund.

> For large 401(k) plans with over a billion dollars in total
> assets…mutual funds will often waive an investment minimum for
> institutional share classes. It is also common for investment advisors
> representing large 401(k) plans to call mutual funds and request
> waivers of the investment minimums so as to secure the institutional
> shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010),

*affirmed* 729 F.3d 1110 (9th Cir. 2013).

118.   In fact, Vanguard expressly "reserves the right to establish higher or

lower minimum amounts for certain investors", including when the "plan sponsor's

aggregate assets within the Vanguard Funds will likely generate substantial

economies in the servicing of their accounts."[59]

119.   During the proposed class period, the Schneider Electric Defendants

had the fiduciary authority or responsibility over the selection and retention of the

share class used for each of the Plan's investments. ██████████████

████████████████████████████████████████████████

██████████████████████████████.[60]

120.   Despite the fact that lower-cost shares for the exact same investment

option were available to the Plan, the Schneider Electric Defendants selected and

---

[59] *See* Vanguard Funds Multiple Class Plan,
https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multipleclassplanv
anguardfun.pdf.
[60] Inv. Mgmt. Agr., Sch. A (2.d.).

continue to retain higher-cost shares for the Plan investment options than were available to the Plan based on its enormous size.

121.    From 2014 through February 2017, the Schneider Electric Defendants provided the Oppenheimer Global Opportunities Fund (Y shares) (OGIYX) that charged 92–94 bps, when the lower-cost R6 shares (OGIIX) were available for 74–75 bps. The Plan's higher-cost shares were 18–19 bps higher, which resulted in participants paying 25% more in unreasonable expenses. The Schneider Electric Defendants also provided the Prudential Jennison Small Company Fund (Z shares) (PSCZX) that charged 83–84 bps, when lower-cost Q shares were available for 69 bps. This caused participants to pay over 20% more in unreasonable expenses (14–15 bps) for the identical investment. In addition, the Schneider Electric Defendants provided the higher-cost Plus shares of the Vanguard Target Retirement Trust funds when they could have provided the lower-cost Select shares, which were available on June 30, 2015. [61] This caused participants to pay 20% more for the exact same investment.

122.    Following the fund changes in February 2017, Aon Hewitt initially removed all Vanguard index funds. For the Vanguard Developed Market Index, the Emerging Markets Index, the Institutional Index, and the Total Bond Market Index funds, the Schneider Electric Defendants provided the lowest-cost Institutional Plus shares.[62] When these funds were added back to the Plan, the Schneider Electric

---

[61] *E.g.,* Vanguard Target Retirement 2020 Trust Select Fact Sheet Mar. 31, 2020, https://institutional.vanguard.com/iippdf/pdfs/FS1676.pdf.

[62] During the proposed class period, these Vanguard index funds paid no revenue sharing from their expense ratio to the Plan's recordkeeper.

Defendants selected the higher-cost Institutional shares classes. They also used the Institutional shares for the Vanguard Emerging Markets Index Fund even though the lower-cost Institutional Plus shares were available since 2010.[63] The Schneider Electric Defendants provided the higher-cost shares even though the Plan invested over $450 million collectively in these five index funds by year-end 2017, and over $633 million by year-end 2018. Other than the Vanguard Institutional Index Fund, for which Defendants finally provided Institutional Plus shares in 2019, the Plan remains invested in the higher-cost shares of the other four Vanguard index funds.

123.    The Schneider Electric Defendants also provided higher-cost Class S shares of the Aon Hewitt collective investment trusts when the lower-cost Class I shares were available.[64] This decision alone caused Plan participants to incur over $600,000 annually in unnecessary expenses based on the Plan's assets invested in the Aon Hewitt funds in 2017 and 2018.

124.    By providing Plan participants the more expensive share classes of Plan investment options, the Schneider Electric Defendants caused participants to lose millions in retirement savings.[65]

---

[63] Vanguard International Equity Index Funds, Form N-CSR, Oct. 31, 2011, https://www.sec.gov/Archives/edgar/data/857489/000093247112000012/intequityindex_final.htm.

[64] Aon Hewitt Investment Trust Offering Statement, June 2019, at 65; Oct. 2016 Offering Statement at 61. During the class period, the Aon Hewitt collective investment trusts paid no revenue sharing from their expense ratio to the Plan's recordkeeper.

[65] Plan losses have been carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

**VI.  The Schneider Electric Defendants breached their fiduciary duties by causing the Plan to pay unreasonable recordkeeping fees.**

    **A.  The actions of prudent fiduciaries in monitoring recordkeeping expenses and making sure they are reasonable in light of all services provided.**

125.  Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

126.  Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services. In light of the commoditized nature of the essential recordkeeping services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans.

127.  The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the

participant's account.[66] Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant. Because of economies of scale, large plans get lower effective rates per participant than smaller plans. Plans with 20,000 participants or more can obtain much lower rates per participant than a plan with 1,000 participants.

128.    A study commissioned by the U.S. Department of Labor in 1998 demonstrates these economies of scale, finding that as the number of plan participants increases, the cost per participant decreases.[67] Per the Study, the below expenses were based on quotations "of major 401(k) service providers."[68]

---

[66] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management—Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/ attachments/global/Retirement/DC%20Fee%20Management%20%20Mitigating%20Fiduci ary%20Risk%20and%20Maximizing%20Plan %20Performance.pdf ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.") ("Mercer Best Practices").

[67] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[68] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").

| Number of Participants | Service Provider Cost Per Participant |
|:---:|:---:|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

129.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of plan assets.[69] Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.[70]

130.    For example, if a plan has 50,000 participants, a fiduciary could negotiate a plan-level contract to pay the recordkeeper $1,500,000 per year, based on a rate of $30 per participant fee per year. The negotiated $1,500,000 recordkeeping fee then can be assessed to participant accounts pro rata so that smaller accounts pay a smaller portion of the fee. If the plan's assets increase during the contract while the number of participants stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

131.    A fixed-dollar compensation arrangement does not necessarily mean,

---

[69] Mercer Best Practices at 3 ("1. Price administrative fees on a per-participant basis.").

[70] *Id.* ("Negotiate a fixed-rate recordkeeping fee, based on the number of participants with account balances in the plan, that is independent of the investment structure (referred to as an 'open investment architecture' model). This approach, unlike an 'asset-based' or 'bundled' model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.").

however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan; and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best.

132.   In that case, the rate of $30 per-participant multiplied by the number of participants would be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance while the plan pays only a fixed amount unrelated to asset size. If the plan in the example had $6 billion in assets, each participant would pay a direct recordkeeping fee of .025% of her account balance annual for recordkeeping ($1,500,000/$6,000,000,000 = .00025). As the plan assets increase thereafter, the *plan* is still paying the same $1,500,000 price that was negotiated at the plan level, but the fees paid by individual participants changes as they are proportionally allocated among participants based on account balance.

133.   Mutual funds are commonly provided as investment options in retirement plans. Mutual funds sometimes agree to pay recordkeepers a percentage of fund assets to compensate for the cost of recordkeeping a plan, an arrangement called "revenue sharing." This asset-based fee is negotiated between the mutual fund and the recordkeeper and usually is concealed. It is designed to compensate

recordkeepers for smaller plans, and thus can overcompensate a recordkeeper in large plans with large investments in the mutual funds because it is asset based. Although paying for recordkeeping with an asset-based fee is not a *per se* violation of ERISA, it can lead to excessive fees if not monitored and capped by the plan fiduciary. If a fiduciary allows the plan recordkeeper to be compensated with an asset-based fee, the payments can become excessive based on an increase in plan assets alone. For example, the S&P 500 increased over 25% in 2019, leading to large increases in asset-based fees for services which have not changed. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

134.    To make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of compensation received by plan recordkeepers—including, without limitation, any revenue sharing or payments from managed account providers—and determine whether the compensation is reasonable for the services provided.

135.    If a fiduciary decides to use an asset-based fee to pay for recordkeeping, prudent fiduciaries recognize that it is critical to (1) negotiate a fixed amount of recordkeeping compensation based on a reasonable rate per participant per year; (2) determine all revenue sharing and other sources of compensation the recordkeeper receives from plan investment options; and then (3) recover all

revenue sharing payments that exceed the negotiated compensation.

136.   Experts in the field agree that the most certain way to determine the least compensation a plan must pay for a desired level of recordkeeping services is to put the plan's recordkeeping services out for competitive bidding on a regular basis. Prudent fiduciaries do this every three years.[71] For example, Fiduciary360's Prudent Practices for Investment Stewards, [72] which is widely accepted as the global fiduciary standard of excellence, advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and "[c]onsideration is given to putting vendor contracts back out to bid every three years."[73]

137.   Cerulli Associates stated in early 2012 that more than half of the plan

---

[71] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable,* DEFINED CONTRIBUTION INSIGHTS, Jan./Feb. 2006, at 4 (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches*, FIDUCIARY INVESTMENT ADVISORS (April 2015); John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy*, Jan. 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process,* INHUB, May 18, 2015, https://d1yoaun8syyxxtcloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2.

[72] *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary 360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees and investment committee members, investment advisors and investment managers and is widely used in the industry.

[73] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).

sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These Requests for Proposal ("RFPs") were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[74] The Department of Labor noted that fiduciaries conduct an RFP to assess the reasonableness of the service provider's fees every three to five years.[75]

138.    A large corporate 401(k) plan recordkept by Hewitt Associates, LLC (nka Alight) during the relevant period is the Nike Inc.'s 401(k) Plan. With approximately 19,000 to 26,000 participants, the Plan paid $21 per participant for recordkeeping services in 2012 and 2016.[76]

139.    Another large plan, the New Albertson's Inc. 401(k) plan left Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") for Vanguard in 2016. A fee disclosure after this change states that this plan pays a fixed annual fee of $31 per participant for recordkeeping services.[77] The Form 5500 in 2016 confirms that the New Albertson's 401(k) Plan, with approximately 31,000 participants, paid approximately $31 per participant for recordkeeping services.[78] Similarly, the Albertson's LLC 401(k) Plan, with approximately 17,200 plan participants in 2016,

---

[74] Rebecca Moore, *Most Recordkeeping RFPs to Benchmark Fees*, PLANSPONSOR, Jan. 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

[75] U.S. Dept. of Labor, *Meeting Your Fiduciary Responsibilities*, at 5–6 (2012).

[76] Nike, Inc. 2016 Form 5500 with 26,568 participants with an account balance and compensation to recordkeeper, Hewitt. Nike, Inc. 2012 Form 5500 with 19,362 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable on the Forms 5500.

[77] New Albertson's Inc. 401(k) Plan Fee Disclosure, *Cates v. Tr. of Columbia Univ.*, No. 16-6524, Doc. 292-6 (S.D.N.Y. July 1, 2019).

[78] Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.

paid approximately $29 per participant for recordkeeping services.[79]

140.    Fidelity recently stipulated in litigation that the value of the
recordkeeping services it provided to its own 55,000-participant plan was $21 per
participant in 2014, $17 per participant in 2015 and 2016, and $14 per participant
after 2017. *Moitoso v. FMR LLC*, --- F.Supp.3d ----, 2020 WL 1495938, at *15 (D.
Mass. Mar. 27, 2020) ("The parties have stipulated that if Fidelity were a third
party negotiating this fee structure at arms-length, the value of services would
range from $14–$21 per person per year over the class period, and that the
recordkeeping services provided by Fidelity to this Plan are not more valuable than
those received by other plans of over $1,000,000,000 in assets where Fidelity is the
recordkeeper."); *Moitoso v. FMR, LLC*, No. 18-12122, Doc. 138-67 at 3–4 (D. Mass.)
(stipulating to the recordkeeping fees discussed above and further stipulating that
"[h]ad the Plan been a third-party plan and negotiated a fixed fee for recordkeeping
services at arms-length with Fidelity, it could have obtained recordkeeping services
for these amounts during the period.").

**B.    Contrary to the practices of prudent fiduciaries, the Schneider
Electric Defendants failed to obtain a reasonable
recordkeeping fee for the Plan.**

141.    Since January 1, 2010, the Schneider Electric Defendants have
retained the Vanguard Group, Inc. as the Plan's recordkeeper. Vanguard also
provided recordkeeping services to other Schneider Electric Plans, including the
Schneider Electric USA, Inc. Coordinated Bargaining Employee Supplemental Plan,

---

[79] Form 5500 for 2016 for Albertson's LLC 401(k) Plan and Master Trust Form 5500.

the Juno Manufacturing 401(k) Plan for Fishers Union Employees, the Industrial Repair Services 401(k) Plan, the Juno Manufacturing, Inc. 401(k) Plan for Union Employees, and the Schneider Electric Telvent 401(k) Plan.

142.   Throughout the class period, Vanguard has been paid primarily through a combination of direct charges to participant accounts and asset-based fees paid from the Plan's investments. In light of all direct and indirect sources of revenue, the Schneider Electric Defendants failed to negotiate a reasonable amount with Vanguard for recordkeeping services.

143.   From 2014 until April 2017, Vanguard charged participants a $15 per-participant annual fee. Vanguard also received revenue sharing payments from the Dodge & Cox Fund, the Loomis Sayles Investment Grade Bond Fund (Instl), the Oppenheimer Global Opportunities Fund (Y), the Prudential Jennison Small Company Fund (Z), and the Vanguard Prime Money Market Fund (Inv) (2014 only). Effective April 1, 2017, the annual per-participant fee increased to $38 per participant.

144.   The payments set forth above do not reflect the total compensation Vanguard received from providing Plan recordkeeping services. As described in further detail below, during the class period, Vanguard has provided managed account services to Plan participants. Through the Vanguard Managed Account Program, Vanguard provides individualized investment advice to Plan participants to assist them with investing their retirement assets in the Plan. The advisory services are offered by Vanguard Advisers, Inc. based on software developed by

Financial Engines Advisors, LLC.

145.    For managed account services, Vanguard charges an asset-based fee under a tiered fee schedule.[80] Vanguard has charged the same asset-based fees under the following fee schedule throughout the class period:

- 0.40% of your balance per year for the first $100,000 in your account.
- 0.30% of your balance per year for the next $150,000 in your account.
- 0.20% of your balance per year for the next $250,000 in your account.
- 0.10% of your balance per year for amounts over $500,000 in your account.

The minimum annual fee is $60.00.

146.    From 2014 through 2018, the amount Vanguard received putatively for providing managed account services has dramatically increased from approximately $790,000 to $1.3 million, an increase over 60%.[81] Vanguard Advisers, Inc. may also share a portion of the revenue it received from providing managed account services to its recordkeeping affiliate who provided recordkeeping services to the Plan, the Vanguard Group, Inc.

147.    The Schneider Electric Defendants failed to properly monitor Vanguard's total compensation from all sources in light of the services Vanguard provided and thus caused the Plan to pay unreasonable recordkeeping fees. When a recordkeeper is compensated for also providing managed account services to defined contribution plan participants, a prudent fiduciary monitors this source of revenue and leverages it to obtain lower recordkeeping fees, or a reduction in the managed

---

[80] *E.g.,* Schneider Electric Annual Plan Fee Disclosure, as of June 11, 2019, at 3.
[81] These amounts were derived by subtracting the direct payments Plan participants paid to Vanguard for recordkeeping services from the amount of the total direct compensation Schneider Electric reported that Vanguard received on the Plan's Forms 5500.

account fees. However, the Schneider Electric Defendants failed to do so.

148.    Based on the Plan's features, the nature of the recordkeeping services provided by Vanguard, the Plan's total number of participants (18,000–26,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan in the time frame from 2010 through 2018 would have been $558,000–$806,000 (or at most $31 per participant with an account balance). This is consistent with recordkeeping fees charged by Vanguard and other prominent recordkeepers after requests for proposal during the period.

149.    Based on the direct payments paid by Plan participants and the annual revenue share (or asset-based recordkeeping fees) paid by the Plan's investments, the Plan paid up to $55 per participant ($1.1 million on average) from 2014 through 2018.[82] During this period, the Plan had 18,934 to 26,475 participants with account balances, resulting in substantial unreasonable recordkeeping fees each year, all of which was paid from Plan assets, meaning from participants' retirement accounts.

150.    In light of the foregoing facts, it is evident that the Schneider Electric Defendants failed to conduct a competitive bidding process for the Plan's recordkeeping services since Schneider Electric hired Vanguard as the Plan's recordkeeper in 2010. Their actions are contrary to industry practices and the recommendations of the Department of Labor. A competitive bidding process for the

---

[82] The revenue share (or asset-based recordkeeping fees) charged on the Plan's investments was applied to the investments' year-end assets as reported on the Plan's Forms 5500.

Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. That is particularly so because recordkeeping fees for enormous plans such as the Plan have been declining since 2014. By failing to engage in a competitive bidding process for Plan recordkeeping fees, the Schneider Electric Defendants caused the Plan to pay unreasonable recordkeeping fees for the services rendered.

151.   The foregoing facts also demonstrate that the Schneider Electric Defendants failed to retain an independent third party to appropriately benchmark the reasonableness of the direct and indirect compensation received by Vanguard to ensure that only reasonable fees were charged to Plan participants for recordkeeping services and advice.

152.   By failing to prudently monitor and assess the Plan's recordkeeping fees, and obtain competitive bids for the Plan's recordkeeping services, the Schneider Electric Defendants caused Plan participants to lose millions in retirement savings through unreasonable recordkeeping fees.[83]

## VII.   The Schneider Electric Defendants caused the Plan to pay unreasonable managed account fees.

### A.   The managed account services market.

153.   Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of assets classes, commonly referred to as asset allocation. Rather

---

[83] Plan losses have been carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

than selecting investments from the universe of available investment options, the managed account available to Plaintiffs limited the funds available only to those already in the Plan to create plan participants' asset allocations. Plan participants can allocate any percentage of their 401(k) account or contributions to managed account services.

154.    Most managed account service providers, including Financial Engines and their competitors, utilize computer programs based on modern portfolio theory and Monte Carlo simulations to create plan participants' asset allocations.[84] Representatives can modify client-directed inputs but cannot modify outputs and recommendations from the software program. Fees play a large role in the returns based on the managed account providers' services.

155.    Managed account service providers are fiduciaries because they act as investment managers exercising discretionary authority or control over the participant's assets. Plan fiduciaries can contract directly with a managed account provider to offer managed account services to plan participants. Some managed account providers use "subadvised" arrangements to offer their services through a recordkeeper.

156.    Managed account service providers use two types of information strategies to create asset allocations for participants. The first type of strategy is

---

[84] Monte Carlo simulation "describes the range of outcomes from a given asset allocation assuming various inputs for expected returns, volatilities, and correlations of investment options in the plan." United States Government Accountability Office, *401(K) PLANS: Improvements Can be Made to Better Protect Participants in Managed Accounts*, Report to Ranking Member, Committee on Education and the Work Force, House of Representatives, June 2014, at 16 n.33, https://www.gao.gov/assets/670/664391.pdf ("2014 GAO Study").

referred to as customized service—allocating a participant's account based solely on age or other factors that can be easily obtained from the plan's recordkeeper, such as gender, income, current account balance, and current savings rate. The other strategy is referred to as personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets.

157.    From 2012 to 2014, managed account service providers that offered a personalized service reported that generally fewer than one third, and sometimes fewer than 15%, of plan participants using the managed account service furnish this personalized information.[85] When the personalized data is used, asset allocations are nearly the same (less than a 5% difference), or do not change, from the customized services asset allocation decisions.[86] Therefore, when a plan sponsor selects a managed account provider that charges for personalized services, participants are not getting the full value of the services for which they are paying an unnecessarily higher fee.

158.    Without personalized information from plan participants, managed accounts are similar to other lower-cost asset allocation solutions. For example, target date funds, like managed accounts, provide simple investment portfolio decisions for plan participants by providing a professionally managed asset allocation that is targeted to participant time horizons with a professional managing the asset allocation glide path. Indeed, Financial Engines cites target

---

[85] 2014 GAO Study at 20.
[86] *Id.*

date funds as potential substitutes for its management account services.[87]

159.   Customized and personalized managed accounts often offer little to no advantage over lower-cost funds of funds, such as target-date funds, risk-based funds and balanced funds. Vanguard reported in August 2013 that managed account services generally return less than or equal to the returns of Vanguard's lower-cost professionally managed allocation products, such as target date funds, risk-based funds and balanced funds.[88] Nonetheless, managed account participants with lower rates of return still pay substantial additional fees for managed account services compared to the fees they would incur for target date funds, risk-based funds and balanced funds, which provide similar asset allocations.

160.   As with any investment product, prudent fiduciaries monitor whether the managed account service is providing plan participants value beyond substitute lower-cost alternatives, such as target date funds. As demonstrated by the chart below, lower-cost alternatives, such as balanced funds or target date funds, are prudent alternatives, which provide the objective of participants being able to avoid having to make frequent decisions about asset allocations.[89]

---

[87] Financial Engines, Inc., Form 10-K, Dec. 31, 2016, at 22, https://www.sec.gov/Archives/edgar/data/1430592/000156459017002582/fngn-10k_20161231.htm.

[88] 2014 GAO Study at 30 (*citing* Vanguard, *Professionally Managed Allocations and the Dispersion of Participant Portfolios* (Aug. 2013), and Vanguard, *Target Date Funds and the Dispersion of Participant Portfolios* (Nov. 2012)).

[89] *Id.* at 34.



Figure 8: Example of Annualized Rates of Return from One Record Keeper for Different Types of Professionally Managed 401(k) Portfolios, 2007-2012, Net of Additional Fees

161.    Plan fiduciaries are required to act prudently in selecting and monitoring managed account providers, including monitoring managed account providers' fees in relation to the services provided and other managed account providers' fees, and monitoring the performance of the managed account providers in relation to other alternative, lower-cost products. The additional fee a participant generally pays for a managed account is the primary disadvantage of managed account services.[90]

162.    According to each managed account providers' publicly filed Form ADV disclosures, all managed account service fees are negotiable. The fees are charged

---

[90] 2014 GAO Study at 33.

through various methods: a flat fee, a fee capped percentage-of-assets under management, a tiered assets-under-management fee, an uncapped percentage of assets under management fee, or some combination. Two participants with a similar balance but a different provider, or a fee that was not negotiated, can pay vastly different amounts for the same service.

163.   As of 2014, managed account providers that did not charge a flat rate charged fees ranging from 8 bps to 100 bps of a participant's account balance, and at least one provider offered a $20 per-participant flat fee. [91] The table below shows the difference in fees for participants with an account balance of $10,000 or $500,000 at the start of the class period. [92]

**Table 4: Example of Variation in 401(k) Plan Managed Account Fees**

| Provider | Type of fee | Example of annual fee charged on $10,000 account balance | Example of annual fee charged on $500,000 account balance |
|---|---|---|---|
| A | Flat fee | $20 | $20 |
| B | Variable fee,ᵃ cappedᵇ | $25 | $250 |
| C | Variable fee | $10 | $500 |
| D | Variable fee, direct arrangementᶜ | As low as $8 | As low as $400 |
|  | Variable fee, subadvised arrangementᵈ | As high as $40 | As high as $2,000 |
| E | Variable fee, tiered,ᵉ defaultᶠ | As high as $35 | As high as $1,100 |
|  | Variable fee, tiered, opt-inᶠ | As high as $60 | As high as $2,350 |
| F | Variable fee, tiered | Averages $45-$50 | Averages $2,250-$2,500 |
| G | Variable fee, default | As low as $45 | As low as $2,250 |
|  | Variable fee, opt-in | As high as $55 | As high as $2,750 |
| H | Variable fee, large plan | As low as $25 | As low as $1,250 |
|  | Variable fee, small plan | As high as $100 | As high as $5,000 |

Source: GAO analysis of managed account provider case studies.  |  GAO-14-310

164.   To demonstrate the impact of fees, the below illustration shows the impact of a participant charged an additional annual fee of 8 to 100 bps of their account balance against what the participant would pay in other investments

---

[91] 2014 GAO Study at 39 (Table 4).

[92] *Id.*

without the managed account fee.[93]



Figure 10: Variation in Additional Participant Fees Paid for a Managed Account Over a 20-Year Period Given Different Fee Rates

165.   The 2014 GAO Study reported that there are few independent sources of comprehensive and consistent information on managed account fees charged by providers that participants could use to compare fees across providers, and that even fee information provided in managed account providers' SEC filings was confusing or incomplete. For example, Financial Engines' Part 2A of Form ADV dated March 30, 2020 states that retirement program clients pay 50 to 100 basis points in a tiered-assets under management structure, negotiable to less than 50 bps for plans over $20 million and that "[s]ervice and fees are generally negotiated and subject to agreement."[94] Financial Engines' Form ADV demonstrates that

---

[93] 2014 GAO Study at 42 (Figure 10).

[94] Financial Engines Advisors, LLC, Part 2A of Firm ADV, Mar. 31, 2020, at 17, 20–21 https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_V RSN_ID=633399.

managed account fees are subject to economies of scale. The 2014 GAO Study also noted that managed account fees are subject to economies of scale. Participants in large plans, like the Plan, can obtain significantly lower fees than participants in small plans.[95]

166.    Because managed account service providers provide confusing and incomplete fees in their disclosures, the duty of a plan sponsor—held to the standard of a prudent expert under ERISA—is to carefully analyze fees charged by multiple providers and diligently negotiate fees. The only way for a plan sponsor to accurately compare fees of managed account providers is to obtain competitive bids through a request for proposal. In November 2017, retirement plan investment adviser, Cammack Retirement Group, confirmed the importance of conducting an RFP for managed account services to show a due diligence process by interviewing vendors and "test-driving" their respective products.[96]

167.    Regular negotiation of managed account fees is also necessary because managed account fees charged in the industry fell during the class period. For example, as of 2019, based on Form ADVs of managed account providers that did not charge a flat rate, fees were as low as 3 bps, compared to a low of 8 bps in 2014. Financial Engines acknowledged the "downward pressure on fees [they] charge for services."[97] In 2017, Financial Engines has traditionally reduced its managed

---

[95] 2014 GAO Study at 40.

[96] John Buckley, *Fiduciary Considerations When Adding and Reviewing Managed Accounts*, Cammack Retirement Group, Nov. 2017, https://cammackretirement.com/knowledge-center/insights/fiduciary-considerations-when-adding-and-reviewing-managed-accounts.

[97] Financial Engines, Inc., Form 10-K, Dec. 31, 2016, at 22.

account fees by 1 bp per year, and by 2 bps in 2018.[98]

168.   From the early 2000s to the present, as recordkeeping fees compressed, managed account services have become more utilized in defined contribution plans, and competition for managed account services has increased. In order to capture market conditions and negotiate reasonable fees, prudent practice requires that plan fiduciaries conduct requests for proposals for managed account services every three to five years.

### B.   The Schneider Electric Defendants failed to monitor the Plan's managed account fees resulting in the participants paying excessive fees.

169.   As previously noted, during the class period, the Schneider Electric Defendants retained Vanguard to provide managed account services to Plan participants through the Vanguard Managed Account Program. Vanguard provides these services through Vanguard Advisers, Inc., which bases its investment advice on software developed by Financial Engines Advisors, LLC.

170.   Rather than charging a flat fee for managed account services, Vanguard has charged an uncapped asset-based fee under a tiered fee schedule based on assets invested in a participant's account.[99] This fee is deducted quarterly from participant accounts, like Plaintiffs Turner and Blackwell, who utilized the service.

---

[98] Financial Engines Q3 2017 Results, Earnings Call Transcript, Nov. 2, 2017, https://seekingalpha.com/article/4119985-financial-engines-fngn-q3-2017-results-earnings-call-transcript.

[99] *E.g.,* Schneider Electric Annual Plan Fee Disclosure, June 11, 2019, at 3.

- 0.40% of your balance per year for the first $100,000 in your account.
- 0.30% of your balance per year for the next $150,000 in your account.
- 0.20% of your balance per year for the next $250,000 in your account.
- 0.10% of your balance per year for amounts over $500,000 in your account.

The minimum annual fee is $60.00.

171.    These fees are subject to negotiation, and in "mega" plans such as

Schneider Electric's, with its massive assets, substantially lower rates are available

than for smaller plans. In particular, Vanguard expressly "reserves the right to offer

certain retirement plan sponsors or participants discounted fees or other

promotional pricing."[100]

172.    The Schneider Electric Defendants failed to monitor and control the

asset-based managed account fees paid by Plan participants. Because the Schneider

Electric Defendants did not cap Vanguard's asset-based fees, from 2014 through

2018, the amount Vanguard received for providing managed account services has

dramatically increased from approximately $790,000 to $1.3 million even though

the services provided have remained the same.[101] Despite the substantial increase

in managed account fees paid by participants, the Schneider Electric Defendants

have never negotiated for lower managed account fees or considered a flat fee

unrelated to asset size.

173.    The amount of work performed by Vanguard for managed account

services in this Plan also was far more limited than that performed by other

---

[100] Vanguard Advisory Service Disclosure, Mar. 29, 2013, at 5,
https://retirementplans.vanguard.com/web/pdf/Adv_Service_Disclosure.pdf.
[101] These amounts were derived by subtracting the direct payments Plan participants paid
to Vanguard for recordkeeping services from the amount of the total direct compensation
Schneider Electric reported that Vanguard received on the Plan's Forms 5500.

managed account providers. To develop a participant's asset allocations, Vanguard uses the investment options included in the Plan's investment lineup. By contrast, other managed account providers do not limit their investment decisions to the investments chosen by the plan sponsor. They provide participant asset allocations from a larger universe of investments, including exchange traded funds, to provide broader exposure to certain markets and opportunities to diversify participant retirement assets. In such cases, there is much more work involved for such managers than in managed accounts whose investment options are limited to only those in the 401(k) plan, such as Schneider Electric's.

174.   Vanguard's managed account fees are and were unreasonable for the services provided. Vanguard has admitted that its managed account fees "depend[] on assets managed and plan features but generally start at 40 bps on the first $100,000 of managed accounts".[102] Based on the Plan's assets of $2.7 to $3.7 billion between 2014 and 2018, and the substantial increase in revenue, Vanguard managed a substantial amount of participant assets. Despite the Plan's size and ability to obtain lower managed account fees from Vanguard, the Schneider Electric Defendants allowed Vanguard to charge the highest fees it generally offers to all clients, even those significantly smaller than the Plan.

175.   The unreasonableness of the managed account fees is also shown in comparison to managed account fees charged by other managed account providers.

---

[102] Robert Steyer, *Managed Accounts Slow to Gather Steam*, PENSIONS&INVESTMENTS, Apr. 20, 2020, at 7, https://www.pionline.com/special-report-qdia-managed-accounts/managed-accounts-slow-gather-steam.

For example, Morningstar Retirement Manager charges retirement plan participants in large plans, such as the Plan, fees as low as 5 bps for managed account services. Russell Investments Capital, LLC charges managed account fees as low as 3 bps for large plans, and no greater than 28 bps for managed account services in any plan. ProManage provides managed account services for as low as 5 bps. GuidedChoice charges less than 45 bps for any size plan, and the fee is only applied to the first $100,000 in assets. The essential managed account services of each of these providers are at least equal to the quality of Vanguard's services.

176.   Based on the foregoing facts, it is evident that the Schneider Electric Defendants never engaged in a competitive bidding process to obtain reasonable fees for managed account services. Had they done so, they would have obtained reasonable managed account fees from managed account providers for better or substantially the same services. Because the Schneider Electric Defendants failed to monitor and control the amount participants paid for managed account services, and failed to obtain competitive bids, they caused Plan participants, like Plaintiffs Turner and Blackwell, to lose retirement savings through unreasonable fees for the services rendered.

## CLASS ACTION ALLEGATIONS

177.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

178.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an

alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Schneider Electric 401(k) Plan from May 26, 2014 through the date of judgment, excluding the Defendants.

And the following subclass:

> All participants and beneficiaries of the Schneider Electric 401(k) Plan who utilized the Plan's managed account services from May 26, 2014 through the date of judgment, excluding the Defendants.

179.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The Class includes over 26,000 members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of

Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

180.   A class action is the superior method for the fair and efficient

adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

181.   Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees

and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

  o "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012).

  o "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013).

  o "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

  o U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

  o U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432, at *2.

  o U.S. District Court Judge G. Patrick Murphy similarly recognized the

work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter, Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of

litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

- In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans" after the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 16-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[103] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[104] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[105] Floyd Norris,

---

[103] http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[104] http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[105] http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

*What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[106] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[107] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [108] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[109] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[110] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[111]

### COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO THE AON HEWITT COLLECTIVE INVESTMENT TRUSTS

182.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

183.    This Count alleges breach of fiduciary duties against all Defendants.

184.    Defendants are required to manage the assets of the Plan for the "exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plan", and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims".  29 U.S.C. §1104(a)(1)(A)–(B). Defendants are directly responsible for selecting prudent

---

[106] http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[107] http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[108] http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[109] http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[110] http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[111] http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently. As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

185.    Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by removing the Vanguard Target Retirement Trust target date funds and selecting the proprietary Aon Hewitt Index Retirement Solution target date funds when the Aon Hewitt funds were newly created and had no prior performance history. Defendants also breached their duties by selecting and retaining the Aon Hewitt Growth Fund, the Aon Hewitt Income Fund, and the Aon Hewitt Inflation Strategy Fund. Defendants failed to engage in a reasoned decision-making process to determine that using these funds were in the best interests of Plan participants or prudent, or whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. Defendants' decision to add the proprietary Aon Hewitt funds to the Plan caused the Plan and participants to incur significant performance losses.

186.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

187.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make

good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

188.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT II: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST THE SCHNEIDER ELECTRIC DEFENDANTS RELATED TO UNREASONABLE INVESTMENT MANAGEMENT FEES

189.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

190.    This Count alleges breach of fiduciary duties against the Schneider Electric Defendants.

191.    The Schneider Electric Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting and retaining as Plan investment options higher-cost shares of mutual funds and Aon Hewitt's proprietary collective investment trusts that charged unreasonable investment management fees relative to other investment options that were available to the Plan at all relevant times, including separately managed accounts, collective investment trusts, and lower-cost share classes for the Plan's mutual fund and collective investment trust investments with the identical investment manager and

investments.

192.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

193.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT III: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST THE SCHNEIDER ELECTRIC DEFENDANTS RELATED TO UNREASONABLE RECORDKEEPING FEES

194.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

195.    This Count alleges breach of fiduciary duties against the Schneider Electric Defendants.

196.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George*, 641 F.3d at 798–99. Separately, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying . . .

through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

197.    The Schneider Electric Defendants caused the Plan to pay unreasonable recordkeeping fees to the Plan's recordkeeper, Vanguard. These Defendants failed to engage in a prudent and loyal process for the ongoing retention of Vanguard. They failed to monitor Vanguard's compensation, particularly after Vanguard continued to receive additional compensation through managed account services. The Schneider Electric Defendants failed to put the Plan's recordkeeping services out for competitive bidding on a regular basis, at least every three years, to ensure the Plan's recordkeeper only received reasonable compensation for the services provided.

198.    The Schneider Electric Defendants therefore breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B), as a direct result of which the Plan and participants suffered losses from the reduction of Plan assets by the amount of unreasonable recordkeeping fees and the lost investment returns on those retirement assets.

199.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

200.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary

duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

201.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO UNREASONABLE MANAGED ACCOUNT FEES

202.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

203.    This Count alleges breach of fiduciary duties against the Schneider Electric Defendants.

204.    The Schneider Electric Defendants failed to monitor and control the Plan's managed account fees. These Defendants failed to engage in a reasoned decision-making process to determine that using Vanguard's managed account services were in the best interest of Plan participants or prudent. They failed to negotiate reasonable managed account fees from Vanguard and put the Plan's managed account services out for competing bidding, at least every three years. This caused Plan participants to pay managed account fees that exceeded reasonable fees for the services provided.

205.    The Schneider Electric Defendants therefore breached their duties of

loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B), as a direct result of which the Plan and participants suffered losses from the reduction of Plan assets by the amount of unreasonable managed account fees and the lost investment returns on those retirement assets.

206.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

207.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

208.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT V: FAILURE TO MONITOR FIDUCIARIES AGAINST THE SCHNEIDER ELECTRIC DEFENDANTS

209.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

210.   This Count is asserted against the Schneider Electric Defendants.

211.   Schneider Electric, acting through its Board of Directors, is authorized to appoint members of the Benefits and Investment Committees and, therefore, had

a duty to monitor the performance by those appointees of their fiduciary duties. Each Committee and fiduciary likewise had a duty to monitor the performance of each individual to whom it delegated any fiduciary responsibilities.

212.   A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

213.   To the extent any of the fiduciary responsibilities of Schneider Electric or the Committees were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

214.   Schneider Electric and the Committees breached their fiduciary monitoring duties by, among other things:

    a.   failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.   failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unreasonable fees and imprudent investment options in violation of ERISA;

c.   failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's recordkeeping and managed account fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.   failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

e.   failing to remove appointees whose performance was inadequate in that they continued to allow unreasonable fees to be charged to Plan participants and imprudent investment options to be selected and retained in the Plan, all to the detriment of Plan participants' retirement savings.

215.   As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses. Had Schneider Electric, the Committees, and the other delegating fiduciaries discharged their fiduciary monitoring duties prudently

as described above, the Plan would not have suffered these losses.

## COUNT VI: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(A)) BETWEEN THE PLAN AND PARTIES IN INTERST AGAINST DEFENDANTS

216.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

217.    This Count is asserted against all Defendants.

218.    Aon Hewitt is a party in interest because it is a Plan fiduciary, and an entity providing services to the Plan.

219.    Defendants caused the Plan to use proprietary Aon Hewitt collective investment trusts and caused the Plan to pay Plan assets to Aon Hewitt.

220.     By causing the Plan to pay Plan assets to Aon Hewitt, Defendants caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A).

221.    By causing the Plan to use proprietary Aon Hewitt collective investment trusts and causing the Plan to pay Plan assets to Aon Hewitt, Defendants caused the Plan to engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C).

222.    By causing the Plan to pay Plan assets to Aon Hewitt, Defendants caused the Plan to engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

223.    As a direct result of these prohibited transactions, Defendants caused the Plan to suffer losses in the reduction of Plan assets in amount of the payments to Aon Hewitt and the lost investment returns on those assets.

224.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

### COUNT VII: PROHIBITED TRANSACTIONS (29 U.S.C. §1106(B)) BETWEEN THE PLAN AND FIDUCIARIES AGAINST AON HEWITT

225.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

226.    This Count is asserted against Aon Hewitt.

227.    In causing the Plan to pay Plan assets to Aon Hewitt, Aon Hewitt dealt with the assets of the Plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1).

228.    In causing the Plan to use proprietary Aon Hewitt collective investment trusts and causing the Plan to pay Plan assets to Aon Hewitt, Aon Hewitt acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

229.    In causing the Plan to pay Plan assets to Aon Hewitt, Aon Hewitt received consideration for its own personal account from parties dealing with the

Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

230.    Aon Hewitt is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and to restore to the Plan all profits they made through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a fiduciary of the Plan.

## JURY TRIAL DEMANDED

231.    Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- reform the Plan to obtain bids for managed account services and to pay only reasonable managed account service fees if the fiduciaries determine that managed account services is a prudent alternative to target date or other asset allocation funds;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

May 26, 2020                        Respectfully submitted,

                                   /s/ Christopher Naumes
                                   Robert T. Naumes, BBO # 367660
                                   Christopher Naumes, BBO # 671701
                                   NAUMES LAW GROUP
                                   2 Granite Ave, #425
                                   Milton, Massachusetts 02186
                                   617-227-8444
                                   617-696-2437 (fax)
                                   robert@naumeslaw.com
                                   christopher@naumeslaw.com

                                   *Local Counsel for Plaintiffs*

                                   SCHLICHTER BOGARD & DENTON LLP
                                   Jerome J. Schlichter (*pro hac vice*
                                   forthcoming)
                                   Michael A. Wolff (*pro hac vice* forthcoming)
                                   Heather Lea (*pro hac vice* forthcoming)
                                   Sean E. Soyars (*pro hac vice* forthcoming)
                                   Kurt C. Struckhoff (*pro hac vice* forthcoming)
                                   100 South Fourth Street, Suite 1200
                                   St. Louis, MO, 63102
                                   (314) 621-6115
                                   (314) 621-5934 (fax)
                                   jschlichter@uselaws.com
                                   mwolff@uselaws.com
                                   hlea@uselaws.com
                                   ssoyars@uselaws.com
                                   kstruckhoff@uselaws.com

                                   *Lead Counsel for Plaintiffs*